**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE: JERRY L. ICENHOWER, DBA Seaview Properties; DONNA L. ICENHOWER, *Debtors*, | No. 12-56329 |
| | D.C. Nos. 3:08-cv-02326-BTM-BLM 3:08-cv-02329-BTM-BLM 3:08-cv-02409-BTM-BLM 3:08-cv-02410-BTM-BLM 3:09-cv-00329-BTM-BLM 3:09-cv-00330-BTM-BLM 3:09-cv-00331-BTM-BLM 3:09-cv-00332-BTM-BLM 3:09-cv-00432-BTM-BLM 3:09-cv-00457-BTM-BLM |
| KISMET ACQUISITION, LLC, *Plaintiff-Appellee*, | |
| v. | |
| ALEJANDRO DIAZ-BARBA; MARTHA MARGARITA BARBA DE LA TORRE, *Defendants-Appellants*. | |

| | |
|---|---|
| IN RE: JERRY L. ICENHOWER, DBA Seaview Properties; DONNA L. ICENHOWER, *Debtors*, | No. 12-56418 |
| | D.C. Nos. 3:08-cv-02326-BTM-BLM 3:08-cv-02329-BTM-BLM 3:08-cv-02409-BTM-BLM 3:08-cv-02410-BTM-BLM 3:09-cv-00329-BTM-BLM 3:09-cv-00330-BTM-BLM |
| KISMET ACQUISITION, LLC, | |

*Plaintiff-Appellant,*

v.

ALEJANDRO DIAZ-BARBA;
MARTHA MARGARITA
BARBA DE LA TORRE,
   *Defendants-Appellees.*

3:09-cv-00331-BTM-BLM
3:09-cv-00332-BTM-BLM
3:09-cv-00432-BTM-BLM
3:09-cv-00457-BTM-BLM

OPINION

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
February 11, 2014—Pasadena, California

Filed June 26, 2014

Before: Jerome Farris, N. Randy Smith,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Farris

# SUMMARY*

---

## Bankruptcy

The panel affirmed the district court's judgment affirming in part and vacating in part the bankruptcy court's post-judgment imposition of contempt sanctions on defendants for failing to transfer a Mexican coastal villa to the plaintiff in a bankruptcy adversary proceeding.

The panel held that the bankruptcy court had jurisdiction, post-judgment, to substitute a property transferee because it retained jurisdiction to supervise the course of conduct mandated by the judgment.

The panel held that even though the bankruptcy court's contempt and sanctions orders were based solely on affidavits, they did not violate due process because, in light of the defendants' noncompliance with the judgment, the defendants bore the burden of showing their inability to comply. The panel held that the judgment was sufficiently specific to support a finding of civil contempt because it ordered the defendants to undertake a specific and definite course of conduct: to transfer the villa interest to the plaintiff or its assignee. The panel rejected the defendants' argument that Mexican law rendered compliance with the judgment impossible. The panel also held that the bankruptcy court's findings of contempt for a particular period were not clearly erroneous.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the bankruptcy court did not err in issuing an order abrogating a defendant's attorney-client privilege.

On the plaintiff's cross-appeal, the panel held that the district court did not err in vacating compulsory sanctions of $25,000 per day for a period before the defendants were put on notice that their continued occupation of the villa would trigger such sanctions.

**COUNSEL**

Edward I. Silverman (argued), Sandler, Lasry, Laube, Byer & Valdez, LLP, San Diego, California, for Defendant-Appellant/Cross-Appellee Alejandro Diaz-Barba.

D. Anthony Gaston (argued), Law Offices of D. Anthony Gaston, San Diego, California, for Defendant-Appellant/Cross-Appellee Martha Margarita Barba De La Torre.

Janet D. Gertz (argued) and Ali M.M. Mojdehi, Cooley LLP, San Diego, California, for Plaintiffs-Appellees/Cross-Appellants.

**OPINION**

FARRIS, Circuit Judge:

This appeal arises from contempt sanctions issued by the bankruptcy court against defendants Alejandro Diaz-Barba and Martha Margarita Barba De La Torre (collectively, the "Diazes") for failing to transfer a Mexican coastal villa to plaintiff Kismet Acquisition, LLC. The district court confirmed that the Diazes' conduct was sanctionable, but remanded for consideration of appropriate sanctions. The Diazes appealed the conclusion that their conduct was sanctionable, and Kismet cross-appealed part of the district court's decision reversing the bankruptcy court.

We have jurisdiction pursuant to 28 U.S.C. § 158(d)(1). Despite the district court's partial remand to the bankruptcy court to recalculate the amount of fees and costs, immediate review is proper: this appeal concerns primarily legal questions regarding the propriety of the bankruptcy court's contempt orders, the factfinding to be conducted by the bankruptcy court on remand is not related to a central issue raised on appeal, and the Panel's decision might dispose of the case and obviate the need for factfinding. *See In re Lehtinen*, 564 F.3d 1052, 1057 (9th Cir. 2009); *In re Dyer*, 322 F.3d 1178, 1187 (9th Cir. 2003); *In re Bonner Mall P'ship*, 2 F.3d 899, 904 (9th Cir. 1993). We affirm.

**I.**

*A. The bankruptcy court's underlying judgment.*

Debtors Jerry and Donna Icenhower owned an interest in Villa Vista Hermosa, a coastal villa in Jalisco, Mexico. Their

interest was not a fee simple, as Mexican law prohibits foreign nationals from owning title to land within 100 kilometers of the border or 50 kilometers of the coast. *See Brady v. Brown*, 51 F.3d 810, 814, 817 n.8 (9th Cir. 1995). Rather, Debtors held the beneficial interest in a *fideicomiso* trust — an arrangement wherein a Mexican bank holds title to property and a foreign national is granted the right to its use. *See id.* at 814. A *fideicomiso* trust may be created only with a permit issued by the Mexican Ministry of Foreign Affairs. *See id.*

On March 4, 2002, Debtors purchased H&G, a shell company, and transferred the Villa interest to H&G. On December 15, 2003, Debtors filed for bankruptcy protection. On June 7, 2004, H&G sold the Villa interest to the Diazes for $1.5 million.

On August 23, 2004, the bankruptcy trustee filed an action seeking to avoid the transfer of the Villa interest from Debtors to H&G as a fraudulent conveyance. On August 3, 2006, the trustee filed an action seeking to avoid the transfer from H&G to the Diazes as an unauthorized postpetition transfer. H&G did not appear in either action. By agreement approved by the bankruptcy court on November 30, 2006, Kismet purchased the estate's assets and was substituted for the trustee.

On June 2, 2008, following a bench trial, the bankruptcy court ruled for Kismet in both actions. On the same day, the court issued a separate judgment, ordering the Diazes, under 11 U.S.C. § 550(a):

> [a] to take all actions necessary to execute and
> deliver any and all documents needed to undo

the avoided transfer, and to take all actions necessary to cause the property to be reconveyed to a *fideicomiso* trust naming [Kismet] as the sole beneficiary for the benefit of the bankruptcy estate; or

[b] alternatively, at [Kismet]'s sole option made upon proper noticed motion, the court reserves jurisdiction to enter a monetary judgment in favor of Kismet, and against Defendants, in an amount necessary to make the estate whole at the time of judgment.

On July 29, 2008, the court filed an Amended Consolidated Judgment, in which it clarified that the Villa interest was an interest in a *fideicomiso* trust, not a fee simple, and required the Diazes to comply within 10 days. Following denials of a stay pending appeal by both the bankruptcy court and district court, the Diazes faced a compliance deadline of September 13, 2008.

## B. Initial attempts by Kismet to effect the transfer.

Following the bankruptcy court's issuance of the ACJ, Kismet took the initiative in preparing documents by which the Diazes would transfer the Villa interest. On August 7, 2008, Kismet provided the Diazes a draft power of attorney to be used to convey the Villa interest to Kismet or its assignee. The Diazes objected that the power of attorney involved a conflict of interest, as the persons nominated to act on their behalf worked at the same law firm as Kismet's counsel, and impermissibly allowed Kismet to transfer the Villa interest to persons beyond the jurisdiction of U.S. courts.

On September 4, 2008, Kismet proposed that, rather than execute a power of attorney, the Diazes appear before a notary public in Mexico to execute appropriate transfer documents. On September 9, Kismet sent the Diazes a proposed transfer instrument that named a Mexican company, Axolotl Inmobiliaria S. de R.oL. C.V., Kismet's assignee, as the beneficiary of the *fideicomiso*. The Diazes rejected this document two days later, arguing that it should have specified Kismet as the beneficiary of the *fideicomiso* "for the benefit of the bankruptcy estate" and included language explicitly referencing the bankruptcy case. On September 26, Kismet circulated a new version of the transfer agreement that stated that the bankruptcy court would continue to maintain jurisdiction over the ACJ. Again, the Diazes objected that the document named Axolotl as beneficiary. Also on September 26, counsel for Ms. Barba de la Torre wrote to Kismet, "[M]y client is advised by Mexican counsel that the specific performance portion of the Bankruptcy Court judgment (i.e. undoing of the avoided transaction) cannot at least at this stage of these proceedings, be accomplished under Mexican law."

On September 29, following an ex parte application by Kismet, the bankruptcy court ordered the Diazes to show cause why they should not be held in contempt. On September 30, the bankruptcy court ordered Mr. Diaz to submit to a deposition and produce documents relevant to his and Ms. Barba de la Torre's attempts to comply with the ACJ. At his deposition, Mr. Diaz testified that counsel had advised him that signing the transfer documents would violate Mexican law. He also testified that, pursuant to advice of counsel, he sought to enjoin transfer of the Villa interest through an *amparo* — a Mexican proceeding to ensure that an individual's constitutional rights are not violated by a

Mexican official. The Diazes also submitted declarations from two of their attorneys stating that Mexican law prevented them from complying with the ACJ.

Arguing that these statements waived attorney-client privilege, Kismet moved on October 15 to compel discovery of communications with counsel regarding the "impossibility" defense or correspondence with Mexican officials. The bankruptcy court granted Kismet's motion on October 22. The Diazes produced responsive documents on November 7.

### C. The Diazes' continued delay and obstruction.

The disclosed documents indicate that, rather than make a good faith effort to comply with the ACJ, the Diazes sought to delay and obstruct its implementation. On September 8, Mr. Diaz told his counsel: "I will not sign anything that executes a trust agreement . . . . I will not cooperate with these brigands, making a mockery of [M]exican law and attempting to circumvent it." Mr. Diaz's counsel responded:

> I understand that but we don't need to reveal it to [Kismet's counsel] yet. Better to let him think we are preparing to cooperate while we get our ducks in a row in Mexico. Therefore, [to] the extent [we] can point to defects, we can send back the draft document and make them change it again causing delay.

In another email, Mr. Diaz's counsel noted that her objection to a proposed transfer document "should throw a wrench in the works."

One means by which the Diazes sought to obstruct the bankruptcy court's judgment was by soliciting intervention by Mexican officials. As Mr. Diaz's attorney stated in an email: "I think the only thing we can do now is work with the Mexican authorities to try to ensure that the order cannot be accomplished." On September 4, Mr. Diaz instructed his counsel to lobby Ambassador Joel Hernandez Garcia, a legal advisor in the Mexican Ministry of Foreign Affairs, to sign a document stating that compliance with the ACJ would be impossible under Mexican law. The next day, Ambassador Garcia agreed to sign a more limited form of such a declaration, omitting any statement that the Diazes would be subject to penalties in Mexico if they complied with the ACJ.

On August 6, 2008, Mr. Diaz contacted the Ministry of Foreign Affairs in an attempt to ensure that the Ministry did not issue a *fideicomiso* permit to Kismet. On September 26, the Diazes filed an *amparo*, seeking to enjoin the transfer of the Villa interest. In a September 30 email, an attorney for the Diazes stated that the plan was to keep the *amparo* a secret until they had it recorded, and that they would then want to present the certificate of recording "as an obstacle for transferring title." Nonetheless, the *amparo* was soon dismissed, as Kismet had not sought to have the ACJ recognized in Mexico and thus there was no official Mexican action to enjoin. Finally, the Diazes circulated in Mexico a narrative highly critical of the bankruptcy judge and orchestrated radio advertisements denouncing Kismet.

At a hearing on November 13, 2008, the bankruptcy court held the Diazes in contempt. The court also found that, as a result of the Diazes' actions, Kismet was unlikely to receive a *fideicomiso* permit. However, a permit would not be necessary to transfer the Villa interest to Axolotl, a Mexican

corporation. Thus, the bankruptcy court ordered the Diazes, within one week, to sign a document transferring the Villa interest to Axolotl or another assignee of Kismet. The court ruled that, if the Diazes did not purge their contempt by November 19, compulsory sanctions would issue at the rate of $25,000 per day. The court also imposed compensatory sanctions, retroactive to September 9, of $4,150 per day in lost rental value and $205.48 per day in lost use of the property. Finally, the court required the Diazes to pay Kismet its attorney's fees and costs related to preparing documents to carry out the transfer of the Villa interest.

### D. Renewed attempts to effect the transfer.

The transfer was originally scheduled to close in Mexico on November 19. However, on November 18, the notary public who had agreed to oversee the transaction suddenly withdrew, despite having previously approved the transfer documents. Kismet arranged for a different notary to preside over the closing, but that notary soon withdrew, as well. She reported that she had been contacted by an agent of the Diazes' counsel who had allegedly been hired to investigate the transaction. The notary was thus concerned about the risk to herself if she proceeded with the transaction. Further, she allegedly believed that every notary in the area had been contacted that day to ensure that no notary would participate in the transaction.

On November 20, the bankruptcy court heard argument on why the transfer had failed to close. The Diazes argued that the notaries had withdrawn based on legitimate objections to the transfer, whereas Kismet argued that their withdrawal was solely due to the Diazes' intimidation. The court deferred resolving this dispute until a hearing on

December 4, but ordered the Diazes to close the transaction by November 25. To avoid interference with the notary, the court ordered that Kismet not inform the Diazes of the notary's name until the time of closing.

The closing was scheduled for November 25. Prior to that date, a relative of the Diazes attempted to identify and influence the notary, though the Diazes disclaimed involvement. On November 25, but before the transaction closed, Guillermo Rivera, a close friend of Mr. Diaz, crashed his truck through the Villa's gate and, together with his associates, took the property "hostage." After the transfer was executed, counsel for Kismet learned of Mr. Rivera's actions and that he refused to leave except pursuant to Ms. Barba de la Torre's instructions. Counsel for Kismet requested the Diazes to instruct Mr. Rivera and his associates to vacate the Villa, but the Diazes refused.

### E. The bankruptcy court's further rulings.

At a hearing on December 4, the bankruptcy court ruled that the Diazes were at fault for failing to close the transaction on November 19. The Court imposed compulsory sanctions of $25,000 per day, retroactive to November 20, until the Diazes complied with the ACJ. Rejecting the Diazes' argument that they had complied simply by signing the transfer documents, the court ruled that, if Mr. Rivera had in fact occupied the property on the Diazes' behalf prior to the closing, this would have violated a preliminary injunction, incorporated into the ACJ, which prohibited "making unavailable . . . any part of the villa property." Compulsory and compensatory sanctions would issue until possession was restored.

The Diazes vacated the Villa on December 5. On December 11, the court heard argument and testimony regarding Mr. Rivera's occupation of the Villa. At the end of the hearing, the court found that Mr. Rivera had "invaded" the Villa prior to the closing in concert with the Diazes. The court held the Diazes in contempt of the preliminary injunction, issued compulsory and compensatory sanctions for the period November 25 to December 5, and granted Kismet's application for attorney's fees from November 25 to December 11.

*F. The district court's order.*

On June 15, 2012, the district court issued its decision on appeal. It found no clear error in the bankruptcy court's factual findings and affirmed most of the bankruptcy court's rulings. However, it (1) reversed the imposition of $225,000 in compulsory sanctions from November 26 to December 4, and the imposition of compensatory sanctions for loss of use of the villa, and (2) vacated the district court's awards of attorney's fees and costs and remanded for recalculation of fees and costs.

## II.

This Court's role in bankruptcy appeals is "essentially the same" as that of the district court. *In re Caneva*, 550 F.3d 755, 760 (9th Cir. 2008). We review *de novo* whether the bankruptcy court properly exercised jurisdiction, *Mayweathers v. Newland*, 258 F.3d 930, 934 (9th Cir. 2001); whether it afforded the Diazes due process, *Thomas, Head & Greisen Emps. Trust v. Buster*, 95 F.3d 1449, 1458 (9th Cir. 1996); and whether it correctly ruled that Mr. Diaz waived attorney-client privilege, *Home Indem. Co. v. Lane Powell*

*Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995). We review for abuse of discretion the bankruptcy court's finding of civil contempt and imposition of sanctions. *F.T.C. v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999); *Thomas, Head*, 95 F.3d at 1458. We review for clear error the bankruptcy court's findings of fact in connection with the civil contempt order. *Affordable Media*, 179 F.3d at 1239.

## III.

The Diazes challenge the bankruptcy court's rulings on seven grounds: (1) the bankruptcy court lacked jurisdiction to substitute Axolotl as transferee, (2) the bankruptcy court violated due process in imposing certain sanctions, (3) the ACJ was not sufficiently specific to support a finding of contempt, (4) Mexican law rendered compliance with the ACJ impossible, (5) the bankruptcy court's findings of contempt for the period up to November 25 were clearly erroneous, (6) the bankruptcy court lacked jurisdiction to quantify fees and costs in its order of December 18, 2008, and (7) the bankruptcy court improperly abrogated attorney-client privilege. Kismet cross-appeals on a single ground: that the district court erred in vacating the compulsory sanctions imposed for the period from November 26, 2008, to December 4, 2008. We consider these issues in turn.

## A.

We first consider the Diazes' argument that the bankruptcy court lacked jurisdiction to substitute Axolotl as transferee on November 13, after the ACJ was appealed on August 6. After an appeal is filed, a court generally may not "alter or expand upon the judgment." *In re Padilla*, 222 F.3d 1184, 1190 (9th Cir. 2000). However, a court retains

jurisdiction to supervise a required course of conduct. *See Hoffman v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268, 1276 (9th Cir. 1976) (holding that a trial court retains jurisdiction to modify an injunction post-appeal "where the court supervises a continuing course of conduct and where as new facts develop additional supervisory action by the court is required"); *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1480 n.14 (9th Cir. 1994) (holding that court retained jurisdiction to expand injunction, despite pending appeal, where court was serving supervisory role).

Here, even if substituting Axolotl as transferee constituted altering or expanding upon the ACJ, it was within the bankruptcy court's retained jurisdiction to supervise the course of conduct mandated in the judgment, namely transferring the Villa interest to Kismet (or its assignee). The Diazes had taken action to obstruct this transfer, and the bankruptcy court reasonably concluded that "Kismet would have precious little success in getting a permit for a Fideicomiso trust in Mexico." To account for these changed facts, the bankruptcy court ordered the Villa transferred to Axolotl, which, as a Mexican corporation, could receive the property without using a *fideicomiso*. This order was within the court's jurisdiction.

B.

We next consider the Diazes' argument that the bankruptcy court's contempt and sanctions orders, except those based on evidence submitted at the December 11 hearing regarding conduct starting on November 25, violated due process since they were issued solely based on affidavits. Ordinarily, courts "should not impose contempt sanctions solely on the basis of affidavits." *Peterson v. Highland*

*Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998). However, once an alleged contemnor's noncompliance with a court order is established, the burden shifts to the alleged contemnor to "produce[] sufficient evidence of [its] inability to comply to raise a question of fact." *United States v. Rylander*, 656 F.2d 1313, 1318 (9th Cir. 1981), *rev'd on other grounds*, 460 U.S. 752 (1983). If the alleged contemnor does not raise a question of fact through affidavits, and does not seek the opportunity to present its defense through live testimony, a court does not violate that party's due process rights by holding it in contempt solely based on affidavits. *See Thomas, Head*, 95 F.3d at 1458 (holding that contempt order did not violate due process where, although district court did not hold evidentiary hearing, contemnors "had ample notice and an opportunity to respond to the possibility that the court would find them in contempt" and did not request an evidentiary hearing); *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983) (affirming contempt order issued after show cause hearing in which contemnors could have, but did not, present testimony regarding their inability to comply with order).

Here, there was no dispute that, prior to executing the transfer documents on November 25, 2008, the Diazes did not comply with the ACJ. The Diazes thus bore the burden of showing their inability to comply. In seeking to discharge this burden, the Diazes did not raise an issue of fact through affidavits. Nor did they submit, or ask to submit, oral testimony. But not for lack of opportunity. At the November 13 hearing, Kismet called Mr. Diaz to testify, and there is no indication that the Diazes could not have called witnesses, as well. At the December 4 hearing, the Diazes could also presumably have called witnesses, and they admit that they did not ask that the hearing be continued to allow for a fuller

evidentiary presentation regarding the ordered sanctions. Neither have they argued that there are witnesses they would have called had the bankruptcy court permitted it. Having failed to raise an issue of fact through documentary evidence or to seek to discharge their burden of production through live testimony, the Diazes cannot now argue that the bankruptcy court deprived them of due process.

C.

We turn now to the Diazes' argument that the ACJ was insufficiently specific to support a finding of contempt. A party may be held in civil contempt only if it "violated a specific and definite order of the court." *Dyer*, 322 F.3d at 1191 (quoting *In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002)).

Here, the ACJ was sufficiently specific. Although the bankruptcy court left it to the parties to determine which steps were necessary under Mexican law to create a *fideicomiso*, it nonetheless ordered the Diazes to undertake a specific and definite course of conduct: to transfer the Villa interest to Kismet or its assignee. There was also no ambiguity regarding the proper beneficiary of the *fideicomiso*. "[A] party may freely assign the proceeds of his judgment or the value of his recovery," *Pony v. Cnty. of L.A.*, 433 F.3d 1138, 1144 (9th Cir. 2006), and here, Kismet assigned the benefit of the judgment to Axolotl. Thus, even before it was explicitly ordered on November 13, the Diazes knew they could comply with the ACJ by transferring the Villa interest to Axolotl.

### D.

We next consider the Diazes' argument that Mexican law rendered compliance with the ACJ impossible. Citing authority from outside this Circuit, the Diazes argue that a party may not be held in contempt if compliance with the court's order would require violating the laws of a foreign country. *See Remington Rand Corp.-Del. v. Bus. Sys. Inc.*, 830 F.2d 1260 (3d Cir. 1987); *Kilbarr Corp. v. Bus. Sys. Inc., B.V.*, 990 F.2d 83 (3d Cir. 1993).

Even if this rule applied in this Circuit, the Diazes have not shown that compliance with the ACJ would violate Mexican law. For one, this Court held in *Brady v. Brown*, 51 F.3d 810 (9th Cir. 1995), that a similar order, requiring defendant to execute a power of attorney so that his Mexican property could be conveyed to a *fideicomiso* for plaintiff's benefit, "did not violate Mexican law." *Id.* at 819. Moreover, although a permit from the Ministry of Foreign Affairs is necessary to create a *fideicomiso*, the ACJ respected Mexican *fideicomiso* procedures: it ordered the Diazes to take all actions necessary, according to Mexican law, to create a *fideicomiso*, and the court "expressly retain[ed] continuing jurisdiction in [the ACJ] 'to consider alternative remedies if the trust [could not] be established under Mexican law.'"

The Diazes argue that the ACJ could be enforced in Mexico only if it were officially recognized, or homologated, according to Mexican law. But the ACJ did not need to be enforced in Mexico: the bankruptcy court's *in personam* jurisdiction over the Diazes empowered it to issue an order, enforceable in the United States, requiring the Diazes to take action abroad. *See Ramirez & Feraud Chili Co. v. Las*

*Palmas Food Co.*, 146 F. Supp. 594, 604 (S.D. Cal. 1956), *adopted by* 245 F.2d 874 (9th Cir. 1957) (per curiam).

The Diazes also argue that *fideicomisos* are voluntary agreements and are unenforceable if entered into from the coercion of a foreign government. However, the ACJ does not require that the conveyance documents be enforceable, only that the Diazes sign them. As the bankruptcy court noted, "Once [the] transfer documents are executed, [the Diazes] are free to challenge them in Mexico. . . . They have complied with this Court's order at that point."

Finally, the Diazes argue that signing the conveyance documents would expose them to liability for falsely representing that they were acting voluntarily. Critically, though, the declaration of Ambassador Garcia of the Ministry of Foreign Affairs does not state that signing the *fideicomiso* would subject the Diazes to liability. Nor do other documents from the Ministry. Moreover, even if the Diazes are correct that a foreign court order constitutes duress under Mexican law, it seems highly unlikely, and the Diazes have not shown, that the object of duress is subject to liability for submitting to it. In short, even if "legal impossibility" excuses noncompliance, the Diazes have not demonstrated that compliance with the ACJ was legally impossible.

E.

The Diazes argue that the bankruptcy court's findings of contempt for the period up to November 25 are clearly erroneous. However, there is no question that, prior to executing the conveyance documents on November 25, the Diazes did not comply with the ACJ. To avoid contempt, the Diazes needed to show that, although they had taken all

reasonable steps to comply, compliance was impossible. *See Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 856 (9th Cir. 1992); *Rylander*, 656 F.2d at 1318. Yet, the record reflects actions by the Diazes to delay compliance. Thus, the findings of contempt are not clearly erroneous.

F.

Although the Diazes argue that, in light of their appeal of December 10, the bankruptcy court lacked jurisdiction to enter its order of December 18, quantifying fees and costs awarded in its order of December 4, this issue is moot. The December 18 order was vacated by the district court, and Kismet has not appealed this part of the district court's order.

G.

We turn now to the Diazes' challenge to the bankruptcy court's order abrogating Mr. Diaz's attorney-client privilege with respect to "all documents that refer or relate to communications with or by counsel (a) regarding the defense of 'impossibility' to a sanction of contempt; (b) regarding correspondence with or from any Mexican government official in regards to the [ACJ]."

This order was not error. The crime-fraud exception to attorney-client privilege applies when "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme," and where "the attorney-client communications for which production is sought are 'sufficiently related to' and were made '*in furtherance of* [the] intended, or present, continuing illegality.'" *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007), *abrogated on other grounds by*

*Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009) (quoting *In re Grand Jury Proceedings*, 87 F.3d 377, 381–83 (9th Cir. 1996)). Further, "voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject." *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *see also Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010).

Here, Mr. Diaz testified at his deposition on October 10, 2008, that his communications with counsel contributed to (1) his position that signing the power of attorney prepared by Kismet would violate Mexican law, (2) his decision to contact the Ministry of Foreign Affairs, and (3) his decision to file the *amparo*. This testimony gave the bankruptcy court reasonable cause to believe that Mr. Diaz consulted his attorneys for the purpose of furthering his obstruction of the ACJ. Additionally, having invoked advice of counsel in support of his position regarding Mexican law and his argument that contacting the Ministry and seeking the *amparo* were consistent with compliance with the ACJ, Mr. Diaz implicitly waived privilege with regard to communications on those subjects.

## H.

Finally, we consider Kismet's argument that the district court erred in vacating the compulsory sanctions of $25,000 per day for the period from November 26, 2008 (the day after the transfer) to December 4, 2008 (when the bankruptcy court put the Diazes on notice that continued occupation of the Villa would result in daily compulsory sanctions). Before compulsory sanctions may be imposed, a contemnor must have an "opportunity to reduce or avoid the fine through

compliance." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994). Thus, at the least, a contemnor must be given notice that it will face compulsory sanctions if it fails to take a particular action. *See id.*

Here, even if occupation of the Villa violated the bankruptcy court's preliminary injunction, which was incorporated into the ACJ and prohibited "making unavailable . . . any part of the villa property," the Diazes were not adequately put on notice until December 4 that continued occupation of the Villa would trigger compulsory sanctions. On November 13, 2008, the bankruptcy court ordered compulsory sanctions if the Diazes did not "sign such documents as proffered by [Kismet] . . . [that] show[] a transfer to Axolotl or other assignee that Kismet may designate." Although, on November 20, the bankruptcy court prohibited the Diazes from "tak[ing] any steps to render ineffectual . . . the conveyance document," the court did not notify the Diazes that violating this order would subject them to compulsory sanctions. In any event, the conveyance document was not rendered wholly ineffectual, as it still transferred legal title and permitted Axolotl to invoke Mexican law to protect its property interests. In fact, the bankruptcy court had explicitly recognized that it was concerned with the transfer of title, not securing possession:

> [I]f [occupants of the Villa are] there by the time the thing closes, this is something you may have to deal with on a post-closing basis. . . . [T]he Court is not going to be deciding what would eventually be an eviction proceeding of property in Mexico. Once your client has rights under the transfer documents, your client has whatever rights are conferred

> under Mexico law. This is not the Court's concern.

Not until December 4, when Kismet notified the court of the occupation and compulsory sanctions were imposed until it ended, were the Diazes given an opportunity to avoid sanctions by vacating the Villa.

## IV.

The parties have submitted several requests for judicial notice. Judicial notice may be taken "at any stage of the proceeding." Fed. R. Evid. 201(d). We "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), including "court filings and other matters of public record," *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). We "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c).

Here, the Diazes have requested judicial notice of two notices of appeal filed in the bankrutcy court, and Kismet has requested judicial notice of the Diazes' emergency motion for a stay of judgment pending appeal and the district court's order denying that motion. Each of these requests is unopposed. Kismet has also requested judicial notice of the notarized transfer document executed on November 25, 2008. Although the Diazes challenge the accuracy of the submitted document, their challenge lacks substance. They state merely that the document's accuracy "can be — and is hereby — reasonably questioned"; they do not contend that the Spanish-language document is not what they signed on November 25

or that the document was mistranslated. In fact, they rely extensively on the translation in arguing that the document favors their case. We grant each of the requests for judicial notice.

**AFFIRMED.**